UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X

THE UNITED STATES OF AMERICA,

     - against -                **MEMORANDUM AND ORDER**

LAMONT KAREEM JACKSON,           10 CR 783 (NRB)

                Defendant.
----------------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Defendant Lamont Kareem Jackson ("Jackson") was charged in a one-count indictment with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  On August 8, 2010, an individual called 911 to report that a man possessed a gun near the intersection of East 180th Street and Southern Boulevard in the Bronx ("the Location").  Four officers from the New York City Police Department ("NYPD") responded to the Location.  Three of the officers stopped Jackson, the fourth recovered a gun from a book bag located near him, and the officers placed Jackson under arrest.  Jackson now moves to suppress physical evidence recovered and statements made at the time of his arrest.

For the reasons stated herein, we grant Jackson's motion to suppress.

## BACKGROUND

On February 17, 2011, March 16, 2011, and March 18, 2011, this Court held an evidentiary hearing with respect to Jackson's motion to suppress ("Suppression Hearing").[1]   The Government and Jackson submitted briefing prior the Suppression Hearing, advanced oral arguments at the Suppression Hearing, and filed written submissions following the hearing.

The four officers who responded to the Location testified on behalf of the Government at the Suppression Hearing.   No witnesses testified on behalf of the defense but Jackson submitted two declarations in support of his motion to suppress. Accordingly, the following facts are derived from the testimony at the hearing, the exhibits introduced at the hearing, and Jackson's declarations.[2]

---

[1] Jackson filed his motion to suppress on December 7, 2010 and pre-hearing briefing was completed by January 14, 2011.   When the Court attempted to schedule the evidentiary hearing, the Government advised the Court that the first two weeks of March would be best for the Government's witnesses. Thereafter, the Court scheduled a telephone conference with the parties and advised them that the requested date was unacceptable in light of the fact that Jackson remained incarcerated.   At the Court's insistence, the hearing was scheduled for February 17, 2011.

[2] In this Memorandum and Order, citations to "Tr. ___" are citations to the transcript of the Suppression Hearing; citations to "GX-___" are citations to exhibits introduced by the Government at the Suppression Hearing and received by the Court into evidence; citations to "D. Decl. ¶ ___" are citations to Jackson's Declaration, dated December 7, 2010; and citations to "D. Reply Decl. ¶ ___" are citations to Jackson's reply declaration, filed January 14, 2011.

### A.   The 911 Call

At approximately 2:19 p.m. on Sunday, August 8, 2010, an unknown female ("Caller") placed a call to 911 to report that there was a man in possession of a gun at the Location.   In response to a series of questions from the 911 operator, the Caller described the individual as a Hispanic, light-skinned male, with a medium build, dark brown hair, and who appeared to be 19 or 20 years old.   The Caller also stated that the individual was wearing a red hat, a white t-shirt, and blue jeans, and that he was carrying a black book bag.

According to the Caller, the subject of the tip was part of a group of five males: two Hispanic males and three black males, each of whom appeared to be 19 or 20 years old.   The Caller reiterated that "the one with the gun has a black book bag on, that's what distinguishes him from everybody."   The Caller also speculated that the young men might be affiliated with a gang.

The Caller informed the 911 operator that she wished to remain anonymous.   When asked whether the police could call her back, the Caller agreed.   However, the Caller did not know her telephone number and was unable to provide it to the 911 operator.   Nevertheless, the Caller's telephone number was automatically recorded by the 911 call center.   (GX-2 (SPRINT Report); GX-7 (Audio of 911 Call).)

**B.    The Radio Dispatch**

The 911 operator relayed the Caller's tip to an NYPD radio dispatch officer.   The dispatch officer, in turn, communicated to other NYPD officers that there was a man with gun at the Location and repeated the description that was provided by the Caller.

Shortly thereafter, the NYPD radio dispatch officer called the number that had been traced to the Caller's telephone. Although another individual initially answered the telephone, the Caller picked up the phone soon after and confirmed that she had indeed called 911.   The Caller further specified that the man was in front of 820 East 180th Street, a building near the southwest corner of East 180th Street and Southern Boulevard. (GX-8 (Audio of Radio Dispatch).)

**C.    Government Evidence**

As noted above, four NYPD officers testified on behalf of the Government: Officer John Hubbard ("Hubbard"), Officer James Eirand ("Eirand"), Officer Christopher Woulfe ("Woulfe"), and Lieutenant Jennara Cobb ("Cobb").   The testimony of Officers Hubbard, Eirand, and Woulfe are generally consistent with one another and form the basis of the Court's factual findings.   By contrast, the testimony of Lieutenant Cobb differs in material respects from the testimony of her colleagues, and we reject certain portions of her testimony, as further discussed herein.

### 1.   Officer Hubbard's Testimony

On August 8, 2010, Hubbard was in uniform and was driving a marked vehicle in the Bronx.   Lieutenant Cobb, who was also in uniform, was the passenger in Hubbard's vehicle.  (Tr. 31-32.)

At approximately 2:20 p.m., Hubbard received a radio dispatch regarding a man with a gun at the Location.   According to Hubbard, the radio dispatch described the subject as a light-skinned male with a medium build, who was wearing a red hat, a white shirt, and blue jeans.   Hubbard recalled the NYPD radio dispatch officer stating that the subject was part of a group of male blacks and male Hispanics.  (Tr. 33.)

After hearing the radio dispatch, Hubbard drove southbound on Southern Boulevard toward the Location.  (Tr. 42-43.)  Within a block of the Location, Hubbard observed a number of individuals.   First, Hubbard viewed two males walking northbound on the western side of Southern Boulevard.   One of the individuals was a Hispanic male who was wearing a red hat and a white shirt.   According to Hubbard, the two males were approximately thirty to forty feet north of the intersection and the Hispanic male with the red hat was looking back toward the intersection.  (Tr. 43-47.)   Second, as Hubbard continued driving southbound, he observed Jackson standing in a bus enclosure, which was located a few feet north of the northwest corner of the intersection.   Jackson, an African-American male,

was wearing a red hat, a white t-shirt, and blue jeans.  (Tr.
43-47; D. Reply Decl. ¶ 4; GX-1 (map).)   Hubbard testified that
Jackson was not holding a black book bag at the time.  (Tr. 45,
65.)   Third, Hubbard spotted two males walking southbound across
the  intersection.   One  of  the  individuals  was  a  heavy-set,
Hispanic male who was wearing a white shirt and a red hat.
These two individuals ultimately entered 820 East 180th Street,
the building identified by the Caller.  (Tr. 43-47.)

Hubbard  testified that when he approached the Location, he
made a right turn onto East 180th Street, then made a quick U-
turn, and parked the vehicle so that it was facing eastbound.
(Tr. 48-50.)

Hubbard  exited the vehicle and walked toward Jackson, who
was standing in the bus enclosure.  Hubbard continued around the
rear of the bus enclosure, and Lieutenant Cobb, who had also
exited  the  vehicle,  walked  toward  the  front  of  the  bus
enclosure.  (Tr. 50-53, 65-67.)   According to Hubbard, when he
approached the bus enclosure, Jackson did not have a bag.  (Tr.
50-51, 53.)   Additionally, Jackson made no effort to leave the
scene or run away.  (Tr. 70.)

When Hubbard reached Jackson, Hubbard placed his hands on
Jackson.[3]   He then told Jackson to walk toward the wall of a

---

[3]  Hubbard  testified  that  he  did  not  stop  the  Hispanic  man  in  the  red  hat
walking southbound because that individual was heavy-set and the subject was
described  as  having  a  medium  build.   (Tr.  49.)   Hubbard testified that he

6

building, which was located approximately 15 feet northwest of the bus enclosure.  (Tr. 51-53.)   Although Hubbard testified that he was the first officer to stop Jackson, he noted that Officer Eirand and Officer Woulfe had arrived at the Location, exited their vehicle, and placed their hands on Jackson at approximately the same time as Hubbard did.  (Tr. 52-53.)  Prior to the approach, none of the officers said anything to Jackson. (Tr. 51.)

After Hubbard, Eirand, and Woulfe placed Jackson against the wall of the building, Hubbard turned around and saw that Lieutenant Cobb was standing approximately three to five feet away from him.   Lieutenant Cobb was holding a black bag and simply stated: "Gun."   (Tr. 53-54, 67-69.)   Hubbard testified that he had not observed the bag before Lieutenant Cobb raised it and indicated that there was a gun inside.   (Tr. 53.) Jackson then looked over his left shoulder, toward Lieutenant Cobb, and began to repeat: "that's not my bag, that's not my bag." (Tr. 53-54, 67-69.)

After Lieutenant Cobb indicated that she had recovered a gun, the officers placed Jackson under arrest.  (Tr. 53.)   The time was approximately 2:31 p.m, or twelve minutes after the initial call to 911.  (GX-2.)

---

stopped Jackson, rather than the Hispanic man in the red hat walking northbound, because Jackson was closer to the Location.  (Tr. 49.)

### 2.   Officer Eirand's Testimony

Officer Eirand testified that, on August 8, 2010, he was in uniform and was driving a second marked vehicle in the Bronx. Officer Woulfe, who was also in uniform, was the passenger in Eirand's vehicle.  (Tr. 5-6.)

At approximately 2:15 or 2:20 p.m., Eirand heard a radio dispatch regarding a man with a gun at the Location.   Eirand testified that the NYPD radio dispatch officer described the subject as a male Hispanic, with a medium build and black hair, and who was wearing a red baseball cap, a white shirt, blue jeans, and a black bag.  (Tr. 6-8.)

After hearing the tip, Eirand drove southbound on Southern Boulevard toward the Location.  Eirand parked the vehicle on the west side of Southern Boulevard, roughly in front of the bus enclosure.  (Tr. 9.)  According to Eirand, both police vehicles arrived at the intersection at approximately the same time, but Lieutenant Cobb exited her vehicle approximately 10 to 15 seconds before Eirand or Woulfe exited their vehicle.  (Tr. 13-14.)

Eirand testified that he observed Jackson standing approximately one foot northwest of the bus enclosure. According to Eirand, although Jackson was black and the subject was described as a light-skinned Hispanic, Jackson was wearing a red hat, a white shirt, and blue jeans, which was consistent

with the tip.  (Tr. 10-13.)  Like Hubbard, Eirand testified that he did not see Jackson holding a bag at any time.[4]  (Tr. 13-14.)

According to Eirand, with the help of Officers Woulfe and Hubbard, he then stopped Jackson.  The three officers moved Jackson five or ten feet to the wall of a building located to the west of the bus enclosure and then patted Jackson down. (Tr. 15-17, 25.)  Eirand testified that he did not recall any officer saying anything to Jackson prior to the stop.  (Tr. 15, 25.)  Rather, Eirand testified that the officers simply approached Jackson and patted him down.  (Tr. 25.)

Jackson did not say anything prior to the stop, nor did Jackson say anything "right away" after the officers stopped him.  (Tr. 15.)  However, shortly after the stop, Eirand turned his head and observed Lieutenant Cobb holding a book bag. Jackson also turned around, observed Lieutenant Cobb holding the bag, and began to repeat: "that's not my bag.  That's not my bag."  (Tr. 16.)  Eirand testified that Jackson's statements were not in response to a question posed to him.  (Tr. 16.)

---

[4] In a state court complaint regarding the instant conduct, Officer Eirand swore that Lieutenant Cobb: (1) had observed Jackson with a black book bag over his shoulder; and (2) later observed Jackson drop the book bag to the ground.  Eirand testified that he did not witness Jackson holding the bag or dropping the bag; rather, Lieutenant Cobb informed Eirand about the bag once the officers had returned to the precinct following Jackson's arrest.  (Tr. 26-27; GX-3501-B (criminal complaint).)

### 3.  Officer Woulfe's Testimony

Officer Woulfe testified that on August 8, 2010, he was in uniform and was the passenger in a marked vehicle driven by Officer Eirand.  (Tr. 71-72.)  Woulfe recalled hearing a radio dispatch about a man with a gun at the Location.  According to Woulfe, the subject was described as a man of medium build who was wearing a red baseball cap, a white t-shirt, and blue jeans, and who was carrying a black book bag.  (Tr. 72-74.)

After hearing the radio dispatch, Woulfe and Eirand drove southbound on Southern Boulevard toward the Location.  After exiting the vehicle, Woulfe observed Jackson, who was standing at the bus enclosure near the northwest corner of the intersection.  Jackson was wearing a red hat, a white shirt, and blue jeans.  (Tr. 74-76.)  Woulfe testified that he did not see Jackson carrying a book bag, nor did he see Jackson drop a book bag.  However, when Woulfe exited the vehicle and approached Jackson, he observed a black book bag on the ground approximately three feet in front of Jackson.  (Tr. 76.)

Woulfe testified that he, Eirand, and Hubbard moved Jackson away from the bus enclosure.  (Tr. 77.)  Like Hubbard and Eirand, Woulfe testified that no one made any statements to Jackson prior to the stop.  (Tr. 77.)

After the stop, Jackson turned his head back toward the bus enclosure and said: "that's not my bag."  Woulfe turned in the

same direction and saw Lieutenant Cobb holding a bag in one hand and feeling the bottom of the bag.  (Tr. 77-78.)  With the bag still closed, Lieutenant Cobb nodded for the officers to place Jackson under arrest.  (Tr. 78-79.)  The officers then handcuffed Jackson and placed him in one of the patrol cars. (Tr. 79.)

### 4.   Lieutenant Cobb's Testimony

#### (a)   Background

After Officers Hubbard, Eirand, and Woulfe testified, the Government rested.  When the Court asked whether Lieutenant Cobb would testify, the Government stated that she was not available and asserted that her testimony was not necessary.  In response, the Court expressed concern with the state of the record and noted that none of the Government's witnesses testified that they had observed Jackson holding the bag, dropping the bag, fleeing the scene, or engaging in any furtive conduct.  (Tr. 80-85.)  At the end of the first day of testimony and the subsequent colloquy, the Government moved to reopen the hearing to allow Lieutenant Cobb to testify.  The defense objected and the Court reserved its decision.  (Tr. 110-12.)

On February 22, 2011, the Government advised the Court in an ex parte letter that they were willing to call Lieutenant Cobb as a witness.  However, the Government reported that Lieutenant Cobb had been placed on modified duty as a result of

11

an ongoing investigation that was being conducted by the Bronx
District Attorney's Office.   Additionally, the Government
requested a two-month adjournment of the Suppression Hearing so
that it could learn further information about the investigation
into Lieutenant Cobb's conduct.   By letter dated February 23,
2011, the Court ordered the Government to turn over its <u>ex parte</u>
submission to the defense, and after a subsequent letter
submission, the Court permitted the Government to produce a
redacted version of the February 22 letter.   On March 2, 2011,
the defense notified the Court that it withdrew its objection to
calling Lieutenant Cobb if she could testify in a timely
fashion.   Accordingly, the Court scheduled the continuation of
the hearing for March 16, 2011.

At the second day of the Suppression Hearing, the
Government advised the Court and defense counsel that Lieutenant
Cobb had testified before a grand jury in the Bronx in
connection with a parallel state criminal proceeding against
Jackson.   The Government also advised the Court that it had only
learned about her grand jury testimony that morning, that it did
not know if there was a transcript of the testimony, and
accordingly that it had not produced the testimony as 3500
material.   (Tr. 125-26.)   Following an on-the-record discussion
with counsel, this Court directed the Government to commence its
direct examination of Lieutenant Cobb and postponed cross

examination until the Government could locate the transcript and turn it over to defense counsel.  (Tr. 133.)

### (b)  Testimony at Continuation of Suppression Hearing

Lieutenant Cobb testified that on August 8, 2010, she and Officer Hubbard were on patrol in the Bronx in a marked vehicle. (Tr. 135-36.)  At approximately 2:15 p.m., she heard a radio dispatch stating that there was a man with a gun at the Location.  Cobb recalled that the subject was described as a male Hispanic, of medium build, who was wearing a red hat, and a white t-shirt, who carried a black bag, and who was among a group of male blacks and male Hispanics.  (Tr. 136-37.)  Cobb recalled that the Caller was an anonymous female and testified that she asked the NYPD radio dispatch officer to contact the Caller for additional detail.  (Tr. 137-38.)

Cobb testified that, after hearing the radio dispatch, she and Hubbard drove southbound on Southern Boulevard toward the Location.  According to Cobb, she observed a number of individuals within a block of the Location.  First, she observed two males walking northbound on Southern Boulevard.  Cobb stated that one of the males was wearing a red hat and they both were black and approximately 17 years old.  (Tr. 138-40.)  Second, Cobb saw Jackson standing two feet southwest of the bus shelter. According to Cobb, Jackson, a male black, was wearing a red hat,

a white t-shirt, and carried a black bag over one shoulder.
Cobb further testified that Jackson was watching her vehicle as
it approached the Location.    (Tr. 139-41.)    Third, Cobb
testified that she observed two males walking southbound across
the intersection and into 820 East 180th Street, the building
described by the Caller.  One of the males was a heavy-set male
Hispanic who wore a red cap and a white shirt with a plaid
pattern. (Tr. 141-42.)

Like Hubbard, Cobb testified that Hubbard turned right onto
East 180th Street, made a quick U-turn, and then parked at the
northwest corner of the intersection, facing eastbound.  (Tr.
143.)  Moments after Hubbard parked the first vehicle, Officers
Eirand and Woulfe parked the second vehicle at the intersection.
According to Cobb, she continued to look at Jackson, who had not
moved and who continued to carry the bag.  (Tr. 143.)

Lieutenant Cobb testified that she exited her vehicle and
remained at the edge of the sidewalk.  She then tried to get the
attention of Officers Eirand and Woulfe, who had exited their
vehicle and who, Cobb explained, were looking to her for
guidance.  Cobb testified that she motioned for Woulfe and
Eirand to go around the north side of the bus shelter and yelled
out "red hat" to them.  (Tr. 143-44.)

According to Lieutenant Cobb, she then walked up onto the
sidewalk, took a few steps toward Jackson, and instructed

Jackson, who was looking eastward, to "come here for a second." Cobb testified that Jackson may not have heard her and that he then turned and began walking northbound. Lieutenant Cobb continued to follow Jackson and yelled out: "sir, come here for a second.  I need to talk to you for a second."  However, according to Lieutenant Cobb, Jackson continued walking to the northern corner of the bus enclosure.  At this point, although Jackson was obscured by the opaque north side of the bus enclosure, Cobb was able to see through a six or eight-inch gap in the bus enclosure.  Through this gap, Cobb observed the black bag on the ground.  She then observed Jackson take three or four steps northwest, at which time she instructed Eirand, Woulfe, and Hubbard to "stop him."[5]   (Tr. 145-48.)

Lieutenant Cobb testified that Officers Hubbard and Eirand then grabbed Jackson, and moved him a few feet away, with his back toward Lieutenant Cobb.  According to Lieutenant Cobb, Jackson then turned around and said: "that's not my bag.  You didn't see me with that bag."  Lieutenant Cobb testified that, at the time Jackson made these statements, she had not touched the bag or picked up the bag, but that the bag remained on the

---

[5] Lieutenant Cobb testified that she did not stop the Hispanic man with the red hat who was walking southbound for two reasons.  First, he was heavy-set and the subject was described as being of medium build.   Second, Cobb testified that the heavy-set male was wearing a white dress shirt, rather than a white t-shirt.   Lieutenant Cobb testified that she did not stop the man with the red hat who was walking northbound because her vehicle had passed him before she realized that he was wearing a red hat and that the traffic was too dense to turn around in the middle of the street.  (Tr. 151.)

ground near the bus enclosure. In response, Lieutenant Cobb stated to Jackson: "I didn't see you with this bag?" to which Jackson responded "you didn't see me with that bag." (Tr. 148-49.)

Only then did Lieutenant Cobb pick up the bag, and she testified that based on the weight of the bag, she thought the bag might contain a firearm. (Tr. 149.) According to Lieutenant Cobb's version of the events, she then asked two older Hispanic women who were seated in the bus enclosure whether the bag belonged to them. After the women said no, Lieutenant Cobb opened the bag, looked in it, removed a fabric wrap, and saw a gun. (Tr. 149-50.) She then instructed Officer Eirand to arrest Jackson. (Tr. 150.)

Finally, Cobb testified that on December 10, 2010, four months after Jackson's arrest, the NYPD placed her on modified assignment. At the time, the internal affairs bureau advised Lieutenant Cobb that her reassignment was related to an ongoing criminal investigation by the Bronx District Attorney's office and that she was possibly the subject of the investigation. (Tr. 152-53.) Lieutenant Cobb further testified that she was at an out-of-state training on the first day of the Suppression Hearing.[6] (Tr. 153-54.)

_____

[6] According to the Government's post-hearing submission, the Government initially elected to conduct the hearing without Lieutenant Cobb. The Government provided three justifications for its decision: first, Lieutenant

On March 18, 2011, the Government provided the Court with the grand jury testimony of Lieutenant Cobb as additional 3500 material.  At the same time, the Government provided the grand jury testimony of Officer Eirand, which had not been produced before Eirand testified a month earlier.  The defense rested without further questioning of Lieutenant Cobb.  Additionally, the Government did not move to reopen the hearing for the purpose of questioning Lieutenant Cobb or Officer Eirand about their grand jury testimony.[7]

### D.   Defense Evidence

As noted above, the defense did not call any witnesses at the Suppression Hearing.  However, Jackson filed two declarations in support of his motion to suppress.[8]  In one of

---

Cobb was unavailable; second, the Government was unable to provide information about the ongoing investigation, which would have been relevant to Lieutenant Cobb's credibility; and third, the Government took the position that the testimony of the other three officers would be sufficient to meet the Government's burden.   (Government's Supplemental Memorandum of Law in Opposition to Defendant's Motion to Suppress, dated Mar. 22, 2011, at 4 n.4.) As discussed above, the Government requested leave to call Lieutenant Cobb only after the Court expressed concern with the Government's evidence.

[7] Officer Eirand's testimony focused on chain-of-custody issues.  However, as discussed herein and on the record following the close of the Suppression Hearing, Lieutenant Cobb's testimony presented a substantive account of the events of August 8, 2010, which differed from her testimony before this Court.  To date, the Government has not endeavored to reconcile or otherwise explain these inconsistencies.

[8] In order to raise a fourth amendment challenge, a defendant bears the burden of demonstrating a reasonable expectation of privacy, or standing, and therefore must submit an affidavit demonstrating his or her privacy interest. See United States v. Salvucci, 448 U.S. 83, 86-87 (1980).  This remains the rule even where possession both convicts and confers standing because a defendant's testimony offered in support of a motion to suppress cannot be admitted as evidence of guilt at trial.  Id. at 88-90; see also Simmons v. United States, 390 U.S. 377 (1968).  Thus, Jackson's declarations were filed to satisfy his burden of establishing standing.

the declarations, Jackson states that on August 8, 2010, he was standing on a sidewalk with a bag and was not behaving in a suspicious fashion.  (D. Decl. ¶ 3.)  Jackson asserts that the police officers "suddenly, and for no reason" approached him, seized him, and patted him down, causing him to drop the bag and to disclaim ownership of it.  (D. Decl. ¶¶ 4-5.)

In the other declaration, Jackson states that he is neither Hispanic nor light-skinned, but that he is African-American. (D. Reply Decl. ¶ 4.)  Jackson also states that he was 25 years old at the time of his arrest in August 2010, not 19 or 20 years old.  (D. Reply Decl. ¶ 5.)

## DISCUSSION

Because the police stopped Jackson and seized the bag without a warrant, the Government bears the burden of establishing that its conduct fell within an exception to the warrant requirement.  See, e.g., Arkansas v. Sanders, 442 U.S. 753, 759-60 (1979); United States v. Arboleda, 633 F.2d 985, 993 (2d Cir. 1989) (Oakes, J., dissenting); see generally Moore's Federal Practice § 641.193[2] (3d ed. 2010).

The Government makes two overarching arguments in support of its warrantless stop of Jackson and seizure of the black book bag and its contents.  First, the Government argues that the police had reasonable suspicion to stop Jackson.  According to the Government, reasonable suspicion was based on the details

articulated in the 911 call and on Jackson's suspicious conduct when the police arrived at the scene.   Second, the Government contends that Jackson abandoned the book bag.   Under this theory, the police could lawfully search the bag, even if they lacked reasonable suspicion to stop Jackson.

We address each of these arguments in turn.

### I.   Propriety of the Stop

It is well-settled that under the fourth amendment, an individual may be temporarily detained based on a "reasonable suspicion" of criminal activity.   Terry v. Ohio, 392 U.S. 1 (1968); see also United States v. Arvizu, 534 U.S. 266, 273 (2002).   A police officer may conduct what has come to be known as a "Terry stop" by detaining a person to investigate possible criminal behavior if -- at the time the officer makes the stop -- the officer has "reasonable suspicion" to believe that criminal activity has occurred or is about to occur.   See United States v. Lopez, 321 F. App'x 65, 66-67 (2d Cir. 2009); United States v. Tehrani, 49 F.3d 54, 58 (2d Cir. 1995).

When evaluating reasonable suspicion, the court must assess whether there was "a 'particularized and objective basis' for suspicion of legal wrongdoing under the 'totality of the circumstances.'"   United States v. Simmons, 560 F.3d 98, 103 (2d Cir. 2009) (quoting Arvizu, 534 U.S. at 273).   This assessment must be conducted "through the eyes of a reasonable and cautious

police officer on the scene, guided by his experience and training."  United States v. Colon, 250 F.3d 130, 134 (2d Cir. 2001) (quoting United States v. Bayless, 201 F.3d 116, 133 (2d Cir. 2000)).

### A.   Was There Reasonable Suspicion Based on the Anonymous Tip?

The Supreme Court of the United States held in Florida v. J.L. that an anonymous tip that a person is carrying a gun cannot, alone, provide reasonable suspicion and therefore cannot justify a Terry stop.  529 U.S. 266, 268-71 (2000).  In J.L., the Supreme Court reasoned that:

> [u]nlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.

Id. at 270 (internal citations and quotations omitted).

However, the Supreme Court further reasoned that: "there are situations in which an anonymous tip, suitably corroborated, exhibits sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop."  Id. (internal quotations omitted).  An accurate description of a subject's visible attributes, however, is not suitable corroboration.  Id. at 271-72.  Specifically,

> [a]n accurate description of a suspect's readily observable location and appearance is of course reliable in this limited sense:

> It will help the police correctly identify
> the person whom the tipster means to
> accuse. . . . The reasonable suspicion here
> at issue requires that a tip be reliable in
> its assertion of illegality, not just in its
> tendency to identify a determinate person.

Id. at 272 (internal citations omitted).

The Government has argued that this anonymous tip exhibits sufficient indicia of reliability because: (i) the Caller reported an "emergency"; (ii) the Caller reported contemporaneous observations; (iii) the Caller provided a highly-detailed description of the subject; and (iv) the Caller agreed to be called back and the NYPD radio dispatch officer in fact called her back. We reject the Government's arguments for the reasons detailed herein.

First, we turn to whether the tip reported an ongoing emergency. Recently, the Second Circuit recognized that an anonymous report of an ongoing, active emergency can constitute an exception to the rule in J.L. See Simmons, 560 F.3d at 105. Namely, the Second Circuit held that:

> an anonymous 911 call reporting an ongoing
> emergency is entitled to a higher degree of
> reliability and requires a lesser showing of
> corroboration than a tip that alleges
> general criminality. . . . This approach
> recognizes the need for police to act on
> reports of an emergency situation without
> delay, but still requires police officers to
> corroborate allegations of criminal activity
> in some meaningful way.

Id. (internal citations omitted).[9]   The Government argues that the emergency exception applies here and that the Caller's tip was therefore reliable and provided reasonable suspicion for stopping Jackson.

We disagree.  Simmons involved an anonymous tip about a continuing assault, in which the subject of the tip was possibly armed.   In announcing the emergency exception, the Second Circuit expressly distinguished among tips involving "an ongoing emergency" and tips involving allegations of "general criminality."  By contrast, J.L. involved an anonymous tip that an individual possessed a weapon.   The anonymous tip in the instant case is closer to the weapon-possession tip in J.L. than to the ongoing-assault tip in Simmons.[10]   Furthermore, both the tip in J.L. and the present tip must fall in the category of "general criminality," because if the mere possession of a

_____

[9] The Supreme Court expressly declined to address this issue in J.L.  529 U.S. at 273-74 ("The facts of this case do not require us to speculate about the circumstances under which the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability.  We do not say, for example, that a report of a person carrying a bomb need bear the indicia of reliability we demand for a report of a person carrying a firearm before the police can constitutionally conduct a frisk.").

[10] Specifically, in J.L., an anonymous caller reported to the police that a young black male wearing a plaid shirt was standing at a specific bus stop and carrying a gun.  529 U.S. at 268.  In Simmons, an anonymous caller reported to 911 that an assault (possibly with a gun) was in progress at a specific apartment building and that the subject was a male black, "wearing a grey hoody, [and a] black jacket."  560 F.3d at 101.  Here, the Caller reported that a male Hispanic possessed a gun, and she further detailed the subject's clothing and location.  However, the Caller's tip plainly lacked details that would support the conclusion that there was an ongoing emergency -- for example, that the subject was using the gun, threatening the Caller or others with the gun, or had fired shots.

weapon constituted an "ongoing emergency" under Simmons, the emergency exception would swallow the rule announced by the Supreme Court in J.L. We cannot read Simmons to stand for so broad a proposition.

Our conclusion is further buttressed by the fact that J.L. expressly declined to recognize a "firearm exception" to the standard reasonable suspicion analysis. 529 U.S at 272. The Court rejected the argument that "a tip alleging an illegal gun would justify a stop and frisk even if the accusation would fail standard pre-search reliability testing." Id. In so doing, the Court reasoned that: "[f]irearms are dangerous, and extraordinary dangers sometimes justify unusual precautions. . . . But an automatic firearm exception to our established reliability analysis would rove too far. Such an exception would enable any person seeking to harass another to set in motion an intrusive, embarrassing police search simply by placing an anonymous call falsely reporting the target's unlawful carriage of a gun." Id.

Nor do we think that any other detail relayed in the tip -- and then communicated to the police officers via radio dispatch -- converted the instant situation into an active emergency. The mere speculation that the subject may have been associated with a gang cannot suffice, especially where, as here, nothing

in the tip suggested that the Caller had reliable information about the subject's possible gang affiliation.[11]

Second, the Government argues that the Caller was an eyewitness and that her asserted basis of knowledge makes the tip more credible.  It is far from clear that merely stating one's basis of knowledge would render an anonymous tip sufficiently reliable to justify a Terry stop.  However, even if the 911 operator could have concluded that the Caller was an eyewitness, that information was not communicated to the NYPD radio dispatch officer or to the officers who ultimately stopped Jackson.  It is well-settled that information known to a 911 operator cannot be imputed to the arresting officers.  See Colon, 250 F.3d at 138 ("Here, the dispatcher and arresting officers acted on what they knew to be an anonymous tip containing descriptive but no predictive detail, which was clearly insufficient to provide a basis for reasonable suspicion to support the stop and frisk of [the defendant]. . . . The fact that the 911 operator turned out, after the fact, to have additional information which would have given the arresting officers reasonable suspicion cannot retroactively make their actions objectively reasonable."); see also Simmons, 560 F.3d at

---

[11] As we discuss below, this ruling in no way prevents the police from investigating the bona fides of an anonymous tip by, for example, asking questions (i.e., is this your bag?), observing the subject of the tip, and drawing reasonable inferences based on the subject's subsequent conduct.

108 n.3 ("The parties agree . . . that the investigative stop cannot be justified based on information that the 911 caller provided to the operator, but that was not communicated either to the dispatcher or the investigating officers prior to the stop."). Thus, even if the 911 operator knew that the Caller was an eyewitness and even if this would render the tip more reliable, we must reject this argument because these details were not communicated to the police.

Third, the Government contends that the tip supplied reasonable suspicion because the Caller provided a detailed description of the subject. This argument fails for two independent reasons. As a threshold matter, the Supreme Court itself reasoned that an "[a]n accurate description of a suspect's readily observable location and appearance" does not render an anonymous tip reliable or confer reasonable suspicion that would justify a Terry stop. J.L., 529 U.S. at 272. Moreover, the evidence at the Suppression Hearing underscored that the Caller may have provided a detailed description, but those details did not accurately describe Jackson. Although Jackson was dressed in a red cap, a white shirt, and blue jeans, Jackson is not Hispanic, he does not have light skin, nor is he 19 or 20 years old.[12] Additionally, Officers Hubbard, Eirand,

---

[12] We recognize that a description of skin tone or race may be subjective and that an inaccurate description of skin tone or race in a warrant or in a reliable tip does not necessarily render a resulting stop or search unlawful.

and Woulfe each testified that Jackson was not carrying a black book bag, the detail that the Caller herself flagged as distinguishing the subject from the other individuals at the Location.

Fourth, the Government contends that the tip was reliable because the Caller, although anonymous, agreed to be called back and because the police in fact called her back.  However, the Caller was unable to relay her telephone number, she conveyed that she had recently purchased the phone, and another individual had access to and answered her phone.  These facts suggest that the ability to contact the Caller cannot alone provide the indicia of reliability that would convert an anonymous tipster into a more credible and accountable informant.[13]

---

See Caceres v. Port Auth., 631 F.3d 620, 622-23 (2d Cir. 2011) ("Caceres emphasizes the several physical differences between himself and the descriptive particulars in the warrant. . . . [For example,] Caceres is a light-skinned Hispanic, whereas the warrant specified a black man of dark complexion.  A reasonable officer could have concluded nevertheless that the warrant was for Caceres.  Complexion varies within a given race classification, and the descriptive terms in the warrant reflected one person's subjective classification at one point in time.").  However, in contrast to the warrant in Caceres, the tip here failed to provide justification for the stop in the first instance.  Moreover, the Caller specifically stated that there were two Hispanic males and three black males at the Location, which indicates that the Caller had no difficulty distinguishing Hispanics from blacks.  Therefore, it is curious that the Government, which is advocating the reliability of the tip, would undermine its tipster on this key factor.

[13] Likewise, the defense argues that one could easily infer that the Caller was using a prepaid phone and that she purchased it without disclosing any identifying information.  Although we cannot reach that conclusion based on the present record, we agree that that fact would be relevant to the tipster's reliability.

26

Accordingly, we conclude that the Caller's anonymous tip did not provide reasonable suspicion to stop and frisk Jackson.

### B.   Even if the Tip Were Reliable, Would the Police Have Had Reasonable Suspicion to Stop Jackson?

Assuming _arguendo_ that the anonymous tip was reliable, the tip nevertheless failed to provide the police with a reasonable basis to stop Jackson. As noted above, the Caller described a 19 or 20 year old Hispanic male, who had light skin, dark hair, and a medium build, and who wore a white t-shirt, a red hat, and blue jeans, and who carried a black book bag. However, it would have been abundantly clear to a reasonable police officer on the scene that Jackson dramatically differed from the subject of the tip: Jackson is African-American, not Hispanic; he was 25 years old, not 19 or 20; he has medium to dark skin, not light skin; and according to the three officers who stopped him, he was not carrying a bag. Thus, Jackson matched the description only because he has dark hair and a medium build and he wore a red hat, white shirt, and blue jeans -- and we hardly think blue jeans are a distinguishing factor.

Indeed, nothing the police observed on the scene should have indicated that Jackson was the subject of the Caller's tip, especially when he was standing still, and alone, at a bus enclosure and when two other individuals matched the Caller's description as well as or better than Jackson did. To be clear,

the point is not that if there were three people who matched a
reliable description, the police would be unauthorized to stop
any of the three.  Rather, the point is that the presence of
these other individuals undermines the Government's position
that the Caller's tip was highly detailed.

### C. Was There Reasonable Suspicion Based on Jackson's Conduct on the Scene?

Although we conclude that the 911 call did not provide a
lawful basis for the stop, an individual's furtive, suspicious,
or evasive conduct can provide reasonable suspicion for a stop.
See, e.g., Illinois v. Wardlow, 528 U.S. 119, 124-25 (2000)
("[N]ervous, evasive behavior is a pertinent factor in
determining reasonable suspicion."); United States v.
Ozsusamlar, 278 F. App'x 75, 76 (2d Cir. 2008) (Terry stop
justified by, inter alia, nervous, evasive behavior); United
States v. Thomas, 184 F. App'x 91, 91-92 (2d Cir. 2006) (pat-
down justified by, inter alia, furtive and suspicious conduct).

However, the record here does not support the conclusion
that Jackson exhibited any furtive or suspicious conduct.
Officers Hubbard, Eirand, and Woulfe each testified that Jackson
did not act suspiciously.  Rather, they testified that Jackson
was standing near a bus stop, that he did not flee or otherwise
move when the police vehicles approached the Location, and that

he did not flee or otherwise move when the officers approached him.

We recognize that the record is not wholly devoid of evidence to the contrary. Specifically, Lieutenant Cobb testified that Jackson ignored her commands, walked away as she approached him, moved behind the opaque side of the bus enclosure, dropped a bag behind the bus enclosure, and then proceeded to walk away from the discarded bag. However, the Court cannot credit Lieutenant Cobb's testimony, which is inconsistent with the testimony of the other three officers.[14] Indeed, Lieutenant Cobb's version of the events is implausible for two reasons. First, the three officers uniformly testified that, upon exiting their vehicles, they immediately approached Jackson and stopped him. According to the officers' testimony, they stopped Jackson without hesitation, without waiting for an order, and without observing Jackson move. Accordingly, there

---

[14] It must be noted that Lieutenant Cobb's testimony differs in numerous ways from the testimony of Officers Hubbard, Eirand, and Woulfe. For example, Cobb testified that Jackson had a bag over his shoulder whereas the other three officers testified that Jackson was not holding a bag; Cobb stated that the two men walking northbound were black, whereas Hubbard testified that the man in the red hat was Hispanic; Cobb placed Jackson in a different physical location from the other officers; Cobb testified that she yelled instructions to the other officers, testimony that was directly contradicted by the other officers; Cobb stated that she asked Jackson to approach her at least twice, whereas the other officers stated that no one said anything to Jackson before the stop; Cobb testified that Jackson dropped the bag and then walked away from it whereas the other officers testified that Jackson was standing still; Cobb stated that Jackson disclaimed ownership of the bag before she touched it, testimony that the other officers directly contradicted; and Cobb testified that she opened the bag and observed the gun, whereas the other officers stated that the bag remained closed. Although this list is not exhaustive, it underscores the differences between the two versions of the events.

was insufficient time for Jackson to act in the fashion described by Lieutenant Cobb.   Second, there is no reasonable basis to conclude that Lieutenant Cobb was able to observe conduct that the other officers were unable to observe.   All four officers were in close proximity to one another and to Jackson.   Moreover, the events occurred during the middle of the day, in broad daylight.   Thus, we cannot infer that Lieutenant Cobb was uniquely positioned to observe this furtive conduct.[15]

Accordingly, we cannot conclude that Jackson exhibited any furtive, evasive, or nervous conduct that would furnish reasonable suspicion to stop Jackson.

**II.   Abandonment**

The fourth amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ."   U.S. Const. amend. IV.   When a person voluntarily abandons property, however, he forfeits any reasonable expectation of privacy that he might have had in the property.   See United States v. Davis, 624 F.3d 508, 510 (2d Cir. 2010); United States v. Lee, 916 F.2d

---

[15] We also note that Lieutenant Cobb testified to the evasive conduct nearly one month after the other three officers consistently testified to the contrary.   While we recognize that Lieutenant Cobb's grand jury testimony was not in evidence, it was turned over as 3500 material and was the subject of oral argument.   Specifically, during oral argument, the Court noted that Cobb's prior grand jury testimony clearly contradicts her present testimony regarding Jackson's purported evasive conduct.   As noted above, the Government has left the two versions of Lieutenant Cobb's testimony unreconciled.

814, 818 (2d Cir. 1990).   Therefore, it follows that the fourth
amendment's protections do not extend to property that has been
voluntarily abandoned.   See Lee, 916 F.2d at 818; United States
v. Moskowitz, 883 F.2d 1142, 1147 (2d Cir. 1989).

In determining whether there has been an abandonment, a
court must focus on the intent of the person who purportedly
abandoned the property.   Moskowitz, 883 F.2d at 1147.   "Intent
may be inferred from words spoken, acts done, and other
objective facts."   Lee, 916 F.2d at 818.

The Government argues that Jackson abandoned the bag and
that two facts specifically evidence his intent to abandon the
bag: first, that Jackson dropped the bag; and second, that
Jackson disclaimed ownership of the bag.

According to the Government, Jackson concedes in his
declaration that he dropped the bag and that fact is dispositive
on the abandonment issue.   As a threshold matter, two of the
Government's four witnesses -- Officers Eirand and Hubbard --
testified that they never saw Jackson holding, dropping, or even
standing near a bag.   A third witness -- Officer Woulfe --
testified that he did not see Jackson holding or dropping a bag,
but that he observed a bag approximately three feet in front of
Jackson while Jackson was standing at the bus enclosure.   Only
Lieutenant Cobb testified that she observed Jackson holding the
bag over his shoulder and then stashing the bag at the bottom of

the bus enclosure.  For the reasons discussed above, we cannot credit Lieutenant Cobb's testimony, which is wholly inconsistent with the testimony of the other three officers.

Assuming that Jackson dropped the bag after the police officers arrived, as Jackson states in his declaration, we cannot conclude that this action alone evidenced Jackson's intent to abandon the bag.  Indeed, the case law cited by the Government simply does not support a finding of abandonment based on these facts.  See, e.g., United States v. Thomas, 864 F.2d 843, 846-47 (D.C. Cir. 1989) (affirming finding of abandonment where the defendant, who was being pursued by the police, fled into an apartment building, climbed up a stairwell, left a bag at the top of the stairwell, and then proceeded back down without the bag); United States v. Arboleda, 633 F.2d 985, 991 (2d Cir. 1980) (affirming finding of abandonment where the defendant threw an object out of an apartment window with the objective of getting rid of it before it could be seized by police officers present outside the apartment); United States v. Naut, No. 06 Cr. 601 (JFK), 2007 WL 3084978, at *9 (S.D.N.Y. Oct. 19, 2007) (holding that the defendants abandoned a bag by dropping it, disclaiming ownership in response to police questioning, and thereafter consenting to the search of the bag); United States v. Bass, No. 95 Cr. 672 (AGS), 1996 WL 32426, at *3-6 (S.D.N.Y. Jan. 26, 1996) (holding that the

defendant had abandoned a bag by storing the bag in one train car, sitting in another train car, and twice disclaiming ownership in response to police questioning); United States v. Hincapie, No. 90 Cr. 237 (SWK), 1990 WL 144131, at *1-3 (S.D.N.Y. Sept. 27, 1990) (holding that the defendant had abandoned a bag where the defendant, upon observing a police presence, turned on his heels and reentered a suite with a bag, exited minutes later, again with a bag, and then dropped the bag and disclaimed ownership of it).

We conclude that this is one of the "many circumstances where the mere act of setting down a bag would not constitute abandonment." Thomas, 864 F.2d at 846 ("The law obviously does not insist that a person assertively clutch an object in order to retain the protection of the fourth amendment."). Abandonment fundamentally remains a factual issue and Jackson's declaration does not concede abandonment, nor does the evidence otherwise support a finding that Jackson intended to abandon the bag.

Next, the Government contends that Jackson abandoned the bag by disclaiming ownership of it. Indeed, it is undisputed that a disclaimer of ownership typically evidences intent to abandon. See, e.g., United States v. Welbeck, 145 F.3d 493, 498 (2d Cir. 1998) ("Welbeck cannot be heard to complain that the officers violated his privacy interest in a bag he denied was

his."); <u>Lee</u>, 916 F.2d at 818 ("Based on these unequivocal disclaimers, the district court properly found that Lee intended to abandon his suitcase . . .").

Here, however, all four Government witnesses testified that Jackson's disclaimers followed the unlawful stop.  Additionally, Officers Hubbard, Eirand, and Woulfe each testified that Jackson's disclaimers only followed Lieutenant Cobb's decision to pick up the bag and to feel the contents of the bag through its soft exterior.   Officer Hubbard further testified that Jackson only disclaimed ownership of the bag after Lieutenant Cobb held up the bag and shouted  "gun."   Under every scenario, Jackson's statements followed the unlawful stop.   In light of these facts, we cannot conclude that Jackson's disclaimers are voluntary.   <u>See</u> <u>United States v. Gwinn</u>, 191 F.3d 874, 877 (8th Cir. 1999).

Accordingly, we conclude that Government has failed to carry its burden of establishing that Jackson abandoned the bag.[16]   We again note that this conclusion need not leave law enforcement officials without practical options when presented

---

[16]  Notably, Jackson's conduct falls short of the conduct that typically supports a finding of abandonment, such as throwing or discarding property, running away from property, or disclaiming ownership after direct police questioning.   <u>See, e.g.,</u> <u>Welbeck</u>, 145 F.3d at 499 (repeated disclaimers in response to police questioning); <u>United States v. Aquino</u>, No. 09 Cr. 555 (HB), 2009 WL 3208877, at *4-5 (S.D.N.Y. Oct. 7, 2009) (flight plus dropping item during the course of a police pursuit); <u>United States v. Branch</u>, No. 05 Cr. 1185 (PAC), 2006 WL 2819658, at *6 (S.D.N.Y. Oct. 2, 2006) (removing object from car trunk, then walking away from object and entering subway); <u>United States v. Williams</u>, No. 02 Cr. 1372 (BSJ), 2004 WL 1243603, at *1 (S.D.N.Y. June 4, 2004) (throwing object plus flight).

with an anonymous tip.   Rather, assuming the bag was on the ground, the police could have asked Jackson whether the bag belonged to him, and if he disclaimed ownership, that disclaimer would have provided the evidence of intent to abandon that is absent here.

**III. Statements**

The defense also urges the Court to suppress Jackson's disclaimers as the fruit of the unlawful stop.   The defense argues that the statements closely follow the unlawful stop and therefore should be suppressed.   In opposition, the Government argues that the statements are independent acts of free will that cannot be a suppressible fruit.

We agree that the disclaimers should be suppressed because, under the present circumstances, it is unreasonable to conclude that Jackson's disclaimers were acts of free will that purged the taint of the primary violation.   See Wong Sun v. United States, 371 U.S. 471, 485-87 (1963); United States v. Casado, 303 F.3d 440, 443-49 (2d Cir. 2002).

## CONCLUSION

For the foregoing reasons, we grant defendant's motion to suppress the bag, the gun found therein, and defendant's post-stop statements disclaiming ownership of the bag.

Dated:     New York, New York
           April 12, 2011

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Copies of the foregoing Order have been mailed on this date to
the following:

**Attorney for Government**
Margaret M. Garnett
Elisha J. Kobre
United States Attorney Office
One Saint Andrew's Plaza
New York, NY 10007

**Attorney for Defendant**
Steven M. Statsinger
Federal Defenders of New York Inc.
52 Duane Street, 10th Floor
New York, NY 10007